In the

# United States Court of Appeals
## For the Seventh Circuit

No. 10-1300

EDITH MILESTONE,

*Plaintiff-Appellant,*

*v.*

CITY OF MONROE, WISCONSIN,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 09-cv-199—**Stephen L. Crocker**, *Magistrate Judge.*

ARGUED SEPTEMBER 15, 2010—DECIDED NOVEMBER 21, 2011

Before MANION, SYKES, and HAMILTON, *Circuit Judges.*

SYKES, *Circuit Judge.* Edith Milestone was banned from entering the Senior Center in the City of Monroe, Wisconsin, because she repeatedly violated the Center's Code of Conduct. She sued the City under 42 U.S.C. § 1983 claiming that the expulsion violated her free-speech and due-process rights and that the Code is facially unconstitutional. A magistrate judge granted summary judgment for the City. The judge held that the Senior

Center director, who imposed the expulsion penalty, and the Monroe Senior Citizens Board, which promulgated the Code and approved the order, were not final policymakers for the City, so there was no basis for municipal liability. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Milestone appealed.

We affirm, although on a somewhat expanded analysis. We agree that the Senior Center director and the Senior Citizens Board were not the City's final policymakers for purposes of enforcing the Code of Conduct. Under state and local law, Milestone had the right to ask the Monroe Common Council to overturn the expulsion order, and her failure to do so precludes municipal liability under *Monell* to the extent that the claimed constitutional violations stem from the imposition of the ban. This result does not impose a requirement of exhaustion of administrative remedies under § 1983, but follows from the Common Council's role as the relevant policymaker for the sanction imposed on Milestone.

Milestone's facial challenge to the Code rests on a different foundation, however. By Monroe ordinance, the Senior Citizens Board has the authority to make rules for the Senior Center; the Code itself is therefore city policy. But Milestone's facial challenge is flawed on the merits. The Code consists of reasonable "time, place, or manner" restrictions, and is neither unconstitutionally vague nor overbroad.

## I. Background

Edith Milestone, a senior citizen, lives in Monroe, Wisconsin, a small city that claims the title of the "Swiss Cheese Capital of the U.S.A." Prior to 2008 Milestone often visited the Behring Senior Center, operated by the City of Monroe. The Senior Center is open to the 55-and-over community from Monroe (a/k/a the "cheese city") and the surrounding area. Among other activities, the Senior Center offers classes, meals, exercise programs, and card games.

The Monroe Senior Citizens Board, comprised of nine citizen volunteers, is empowered to adopt rules and regulations to "secure the suitable use and enjoyment" of the "cheese city social center building . . . by senior citizens of Monroe." MONROE, WIS., CODE §§ 2-12-1, 2-12-3(A), (C). Pursuant to this authority, the Board promulgated a Code of Conduct for visitors to the Center. Among other things, the Code prohibits "abusive, vulgar, or demeaning language," "physically threatening" conduct, and disrespectful behavior toward patrons, the Center's staff, and outside instructors. The Code provides that "[v]iolations of this code of conduct will be acted upon by the Senior Center staff or Board of Directors." Copies of the Code of Conduct were posted throughout the building.

Milestone's visits to the Center were fraught with turmoil. Her file included a number of "incident reports" alleging the following disturbances: She engaged in a shouting match at a card game (February 2002); she tried to get the Center's director fired (December 2005); she filed frivolous police complaints about other patrons

(January 2006); she yelled at patrons and staff (February 2006); she advised another patron to go to confession (February 2006); she accused other patrons of spreading rumors about her (October 2007); and she threw playing cards across a table (December 2007). In February 2006 the Monroe city attorney wrote Milestone a letter informing her that the City might have to seek a restraining order against her if she failed to "conform to reasonable standards of decorum while at the Center." The City never followed up on this letter.

In October 2008 Milestone was involved in an incident that led to her expulsion from the Center.[1] While playing cards, Milestone began loudly complaining about the scoring of the game. When the game was finished, Milestone angrily refused to accept the one-dollar prize she had won because she thought that the game had been scored incorrectly. Tammy Derrickson, the Senior Center director, approached Milestone and told her that her behavior was not acceptable. The two got into a heated discussion, which escalated when Milestone wagged her finger in Derrickson's face and threatened to sue her. Derrickson reiterated that Milestone's behavior was unacceptable and told her that she was no longer allowed to visit the Center.

---

[1] There are some factual disputes about what happened during this incident. Because we are reviewing an order granting summary judgment, we recount the facts in the light most favorable to Milestone, the nonmoving party. *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 683 (7th Cir. 2010).

The next day, Derrickson sent Milestone a letter informing her that she was "no longer welcome to attend Senior Center Programs" based on the following violations of the Center's Code of Conduct: "(1) [n]ot treating other participants with respect[;] (2) [a]busive language[;] (3) [n]ot treating Senior Center staff in a respectful man[ner; and] (4) [p]hysically threatening conduct." Before sending the letter, Derrickson reviewed it with the mayor, the city attorney, and the chief of police, but not with any members of the City's Common Council.

Milestone's attorney wrote to the Senior Citizens Board and requested a copy of the Code and any documentation regarding the incident that precipitated her expulsion. An assistant city attorney provided the documents and also informed Milestone's attorney that Milestone could appeal Derrickson's decision to the Senior Citizens Board via a "due process hearing." Milestone exercised this right.

The Senior Citizens Board convened a hearing and heard testimony under oath from Milestone, Derrickson, and other witnesses. In a written decision, the Board affirmed Derrickson's action but modified the ban to remove its apparent perpetual duration. The Board said it would "consider a petition for reinstatement by Edith Milestone upon proof of successful completion of an accredited 'Anger Management' program." The Board also advised Milestone of her right to take an administrative appeal to the City's Common Council within 30 days and that if she failed to do so, the Board's decision would "be treated as a final determination" for

purposes of judicial review. *See* WIS. STAT. §§ 62.12(2), 62.13.

Milestone did not appeal the Board's decision to the Common Council or seek judicial review. Nor did she enroll in an anger-management program. Instead, she filed this § 1983 lawsuit against the City alleging violations of her free-speech and due-process rights under the First and Fourteenth Amendments. A magistrate judge, proceeding by consent, granted the City's motion for summary judgment, holding that Derrickson and the Senior Center Board were not final policymakers for purposes of municipal liability under *Monell*. Though he did not reach the merits, the judge noted that the City had "a legitimate interest in minimizing disruption and keeping the [senior] center a pleasant environment for its visitors."

## II. Discussion

This case comes to us from an order granting summary judgment for the City, so our review is de novo; we construe all facts and reasonable inferences in favor of Milestone, the nonmoving party. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). Milestone argued below and reiterates here that Derrickson's decision to expel her from the Senior Center amounts to viewpoint discrimination in violation of her right to free speech. She also claims the Code of Conduct is unconstitutionally overbroad in that it sweeps in too much protected speech, subjecting it to the threat of punishment. Finally, she alleges several due-process violations. She

claims that: (1) the ban was imposed without a hearing, violating her right to due process; (2) the Code deprived her of fair notice because it does not prescribe specific penalties; and (3) the decision to expel her from the Senior Center violated her right to move about in public places.

The magistrate judge did not reach the merits of these claims but instead entered judgment for the City after finding no basis for municipal liability. To the extent that Milestone's claims relate to the expulsion order, we agree. Milestone sued the City, not Derrickson, who imposed the ban, or the members of the Senior Center Board, who affirmed it. There is no respondeat superior liability under § 1983; the Supreme Court "distinguish[es] acts of the *municipality* from acts of *employees* of the municipality." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986); *City of Okla. City v. Tuttle*, 471 U.S. 808, 818 (1985); *Monell*, 436 U.S. at 691; *see also Lewis v. City of Chicago*, 496 F.3d 645, 656 (7th Cir. 2007) ("Misbehaving employees are responsible for their own conduct, [but] units of local government are responsible only for their policies rather than misconduct by their workers." (quotation marks omitted)). For municipal liability under § 1983, the constitutional violation must be caused by (1) an express municipal policy; (2) a widespread, though unwritten, custom or practice; or (3) a decision by a municipal agent with "final policymaking authority." *Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 629 (7th Cir. 2009); *see also Monell*, 436 U.S. at 694.

Only the third theory of *Monell* municipal liability is at issue here. Milestone argues that Derrickson, or alterna-

tively, the Senior Citizens Board, were final policymakers for the City. Whether an entity has final policymaking authority is a question of state or local law. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989); *Kujawski v. Bd. of Comm'rs of Bartholomew Cnty., Ind.*, 183 F.3d 734, 737 (7th Cir. 1999). Not every municipal official with discretion is a final policymaker; authority to make final policy in a given area requires more than mere discretion to act. *See Darchak*, 580 F.3d at 630; *Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464, 469 (7th Cir. 2001). Whether a public official has final policymaking authority often turns on whether his decisions are subject to review by a higher official or other authority. *See Gernetzke*, 274 F.3d at 469 ("[T]he cases limit municipal liability under section 1983 to situations in which the official who commits the alleged violation of the plaintiff's rights has authority that is final in the special sense that there is no higher authority.").

Here, Derrickson imposed the initial punishment of expulsion, and the Board affirmed her decision with a modification as to its duration. For the City to be liable for these actions, Milestone must first establish that Derrickson or the Board had final policymaking authority with respect to imposing punishments for violating the rules of the Center. It's clear that Derrickson was not a final policymaker. The City never delegated final policymaking authority to the director of the Center; the City Code does not even refer to the position. All of Derrickson's decisions are subject to review by the Senior Citizens Board. She lacked independent authority to impose discipline, let alone the authority to

set general policy on this issue. *See Darchak*, 580 F.3d at 630. Accordingly, Derrickson's actions did not subject the City to liability under § 1983.

Whether the Board is the final policymaker is a somewhat closer question, but we agree with the magistrate judge that under state and local law, and based on the structure of the Board itself, the Board did not have final policymaking authority. Chapter 68 of the Wisconsin Statutes prescribes a general procedure for review of initial administrative determinations like Derrickson's decision to ban Milestone from the Center. *See* WIS. STAT. §§ 68.08, 68.09(1). Specifically, chapter 68 provides that the official who made the initial determination may conduct the review, or "an independent review of such initial determination by another person, committee or agency of the municipality may be provided." *Id.* § 68.09(2). The City empowered the Senior Citizens Board to review the initial determination, and following a full hearing, the Board issued a "Decision on Review" affirming Derrickson's decision.

Importantly, however, Milestone had a statutory right to appeal the Board's decision to the Common Council. Because she "did not have a hearing substantially in compliance with § 68.11 when the initial determination was made," she had an automatic right to this additional level of administrative review. *Id.* § 68.10(1)(a). Indeed, the Board fully advised Milestone of her right to appeal to the Common Council. *Id.* § 68.09(5). In bypassing the Common Council, Milestone deprived the City's final policymaker of the opportunity to review the

acts of municipal subordinates, including their compliance with city policy and even the wisdom of city policy itself.[2]

Apart from state municipal law, the Monroe City Code confirms that the Board is not the final authority for purposes of reviewing the director's decisions. By ordinance the Board has the following powers:

(A)    To govern, manage, control, improve and care for the cheese city social center building and grounds and secure the suitable use and enjoyment thereof by senior citizens of Monroe.

(B)    To oversee professional employees having responsibility for senior citizen programs and activities *subject to policies and procedures adopted by the city for supervision of such employees*.

(C)    To adopt rules and regulations to promote the purposes for which the board has been created.

(D)    To acquire in the name of the city for senior citizen purposes by gift, devise, bequest or condemnation, either absolutely or in trust, money, real or personal property, or any right or

---

[2] Because the Senior Citizens Board issued its decision following a hearing in compliance with chapter 68, if Milestone did not appeal to the Common Council, the Board's decision would be considered a "final decision" for purposes of judicial review. Milestone had the option of filing an action in state court seeking review by certiorari. WIS. STAT. §§ 68.12(2), 68.13(1).

privilege. Gifts to the city of money or other property, real or personal, either absolutely or in trust for senior citizen purposes shall be accepted only after they shall have been recommended by the board to the council *and approved by the council* by resolution. *Subject to the approval of the council*, the board may execute every trust imposed upon the use of property or property rights by deed, testament or other conveyance transferring the title of such property to the city for senior citizen purposes.

(E)     *Subject to the approval of the council*, to buy or lease land in the name of the city for senior citizen facilities within the city, and buildings for senior citizen activities, and, with the approval of the council to sell or exchange property no longer required for its purposes.

(F)     To acquire and maintain such equipment as may be necessary to properly carry out its purposes.

(G)     To promote senior citizen activities within the city as it may deem advisable and its budget may permit. (5-15-1990)

MONROE, WIS., CODE § 2-12-3 (emphases added).

As the provisions we have highlighted attest, the Board has discretion to act in some discrete areas and in others is subject to oversight and control by the City, usually through the Common Council. At issue here is subsection (B) of the ordinance, which gives the Board the authority to oversee the actions of the Center's em-

ployees—subject, however, to policies set by the City. The Common Council's explicit retention of ultimate policymaking authority is key; it confirms that when the Board reviewed Derrickson's decision, it was not acting with final policymaking authority. *See Pembaur*, 475 U.S. at 483.

Finally, the Board's structure suggests that it does not make final policy for the City. Although a creature of municipal law, the Board is not a subcommittee of the Common Council. Of its nine members, only one is also a member of the Council. MONROE, WIS., CODE § 2-12-1(A)2. Up to three may be nonresidents of the City, *id.* § 2-12-1(A)1, and all must "serve without salary or other compensation," *id.* § 2-12-1(B). In short, the Board is a small group of citizen volunteers tasked with guiding the Center's activities, not an administrative body charged with making final policy for the City. Because neither Derrickson nor the Board were exercising final policymaking authority when they imposed and approved the expulsion order, the City cannot be liable under § 1983 for their actions.

To the extent that Milestone's claims are premised on the Code itself, however, a different analysis applies. The Monroe Common Council empowered the Board to make rules for the Senior Center. *See id.* § 2-12-3(C) ("The senior citizen's board is empowered and directed . . . [t]o adopt rules and regulations to promote the purposes for which the board has been created."). The Code of Conduct, though not promulgated by the Common Council, is city policy for purposes of municipal liability under § 1983.

Milestone's First Amendment challenge to the Code itself consists of two distinct arguments. First, she claims that the Code impermissibly discriminates among speakers based on their viewpoint. Second, she contends the Code is overbroad in that it chills too much protected speech. Regarding the first argument, the parties spend considerable energy debating how to classify the Senior Center under First Amendment forum analysis.[3] What is dispositive here, however, is not the nature of the forum but the nature of the regulation

---

[3] In this kind of First Amendment claim, Supreme Court doctrine calls for stricter or looser judicial scrutiny depending on the nature of the "forum" in which the regulations apply. In a traditional public forum, governmental restrictions on speech get strict scrutiny; regulations must be narrowly tailored to serve a compelling governmental interest. *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106 (2001); *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 865 (7th Cir. 2006). Traditional public fora—like streets, sidewalks, and parks—are public places that have traditionally been open for all manner of constitutionally protected speech. *Christian Legal Soc'y v. Martinez*, 130 S. Ct. 2971, 2984 n.11 (2010). Strict scrutiny also applies to regulations in a designated public forum, which the government creates when it "designates" or opens a traditionally nonpublic forum for public discourse. *Walker*, 453 F.3d at 865. A limited public forum (sometimes called a "nonpublic forum") is a place the government has opened only for specific purposes or subjects; speech restrictions in a limited public forum need only be viewpoint-neutral and reasonable in light of the purpose served by the forum. *Id.* at 865-66 & n.2.

in question. If the Code is a content-neutral "time, place, or manner" regulation, it can survive as a reasonable exercise of governmental authority, regardless of which speech-forum category applies. *Frisby v. Schultz*, 487 U.S. 474, 481 (1988); *Ovadal v. City of Madison, Wis.*, 416 F.3d 531, 536-37 (7th Cir. 2005).

The Code contains a mission statement, several objectives, and nine provisions comprising the actual "Code of Conduct." (We have attached a complete copy of the Code in the appendix to this opinion.) The Code is generally aimed at *conduct* not *speech*, but three of its provisions arguably touch upon speech or expression: the requirement that patrons treat everyone with respect and courtesy; the prohibition against abusive, vulgar, or demeaning language; and the requirement that patrons treat Center personnel with respect. In Milestone's view these provisions are viewpoint-based regulations in that they subject any person who disagrees with the director's decisions to permanent ejection from the Center.

We disagree. "Government regulation of expressive activity is content neutral so long as it is '*justified* without reference to the content of the regulated speech.'" *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)). That is, "[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Id.* The Code's mission statement and objectives make it clear that the purpose of the Code is completely unrelated to the content of any

speaker's message. Rather than focusing on *what* the Center's patrons say, the Code focuses on *the manner* in which they say it. Nothing in the Code provides a basis for punishing patrons for disagreeing with other visitors or the Center staff.

Even in a traditional public forum where restrictions on speech are viewed with greatest suspicion, content-neutral time, place, or manner regulations are constitutionally acceptable *if* they are narrowly tailored to achieve a significant governmental interest and leave open ample alternative channels of communication. *Frisby*, 487 U.S. at 481; *Ovadal*, 416 F.3d at 536-37. The Code of Conduct meets these requirements.

First, the Code's stated purpose is to establish a " 'home away from home' " for visitors to the Senior Center, an environment that is "positive," "dynamic," and "pleasant and upbeat." Considering the specific clientele the Senior Center serves, we think this qualifies as a significant governmental interest. By analogy, in *Stokes v. City of Madison*, 930 F.2d 1163, 1170-71 (7th Cir. 1991), we upheld an amplified sound restriction on a mall adjacent to a library, recognizing that the City's interest in maintaining a quiet library environment and protecting library users from unwanted noise justified the restriction. Similarly here, the City's interest in protecting the patrons of the Senior Center from vulgar, abusive language and disrespectful or demeaning treatment by other patrons justifies these provisions.

The Code also satisfies the narrow tailoring requirement. In "time, place, or manner" cases, "narrow tailoring" does not mean that the government must use "the least

restrictive or least intrusive means" to achieve its end; rather, in this context "the requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Ward*, 491 U.S. at 798-99 (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)). Rules requiring the Center's visitors to treat others with respect and to refrain from vulgar, abusive language easily satisfy this standard. The City's interest in maintaining a hospitable place for senior citizens to gather would be seriously undermined absent basic civility requirements.

Finally, the Code leaves open ample channels of communication. Regulations may fail this part of the analysis when they prevent speakers from reaching their target audiences. *Weinberg v. City of Chicago*, 310 F.3d 1029, 1040 (7th Cir. 2002). The Code prevents Senior Center patrons from yelling at others or using abusive language, but it does not prohibit respectful disagreement or inhibit complaints. This is hardly a case in which a speaker's "'ability to communicate effectively is threatened.'" *Id.* at 1042 (quoting *City Council v. Taxpayers for Vincent*, 466 U.S. 789, 812 (1984)). Accordingly, the Code passes constitutional muster as a content-neutral and reasonable time, place, or manner regulation.

Our conclusion on this point also bears on Milestone's claim that the Code is impermissibly overbroad in violation of the First Amendment. *See Grayned v. City of Rockford*, 408 U.S. 104, 114-21 (1972) (rejecting overbreadth claim where ordinance was reasonable restriction, narrowly tailored to further significant governmental inter-

ests). "[A]n overbroad statute must reach a '*substantial number of impermissible applications*' before it may be considered facially invalid." *United States v. Fletcher*, 634 F.3d 395, 402 (7th Cir. 2011) (quoting *New York v. Ferber*, 458 U.S. 747, 771 (1982)). As we have explained, the Code regulates public disturbances and is narrowly tailored to further the City's significant interest in ensuring that the Center remains a welcoming and peaceful place for senior citizens to gather. The Code does not allow punishment based on viewpoint or prohibit respectful criticism or disagreement.

Finally, Milestone makes a due-process void-for-vagueness claim. A law is unconstitutionally vague if it fails to sufficiently define the conduct it prohibits; the point of vagueness doctrine is to permit individuals to conform their conduct to the law's requirements and to guard against arbitrary or discriminatory enforcement. *Grayned*, 408 U.S. at 108-09; *United States v. Dimitrov*, 546 F.3d 409, 414 (7th Cir. 2008). The Code of Conduct is a poor fit with this doctrine because it is just a set of rules of decorum for the Senior Center; it is neither a statute nor an ordinance, and violations do not result in arrest, incarceration, or even a fine. Where the penalties for noncompliance are less severe, a high level of clarity generally is not required. *See Gresham v. Peterson*, 225 F.3d 899, 908 (7th Cir. 2000). Indeed, Milestone points to no case in which a similar local rule was invalidated on vagueness grounds.

To the extent that any analogy can be drawn, the Code is akin to statutes prohibiting disruptive noises, *see, e.g.*, *Grayned*, 408 U.S. at 107-14, disorderly conduct, *see, e.g.*,

*Ovadal*, 416 F.3d at 535-36, disturbing the peace, *see, e.g.*, *United States v. Woodard*, 376 F.2d 136, 140-42 (7th Cir. 1967), or abusive personal behavior against others, such as "aggressive panhandling," *see Gresham*, 225 F.3d at 908-09 (citing cases). All of these laws withstood vagueness challenges. In *Grayned*, for example, the Supreme Court looked to the ordinance itself and its preamble to conclude that it prohibited, in clear enough terms, "deliberately noisy or diversionary activity that disrupts or is about to disrupt normal school activities."[4] 408 U.S. at 110-11. Similarly here, the Code prohibits disruptive behavior that interferes with other patrons' ability to use the Senior Center for its intended purpose. A person of reasonable intelligence would understand this meaning. *Gresham*, 225 F.3d at 908 ("Laws must contain a 'reasonable degree of clarity' so that people of 'common intelligence' can understand their meaning." (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 629 (1984))). To the extent the Code is subject to vagueness analysis at all, it is not unconstitutionally vague.

AFFIRMED.

---

[4] The ordinance at issue in *Grayned v. City of Rockford*, 408 U.S. 104, 107-08 (1972), provided:

"[N]o person, while on public or private grounds adjacent to any building in which a school or any class thereof is in session, shall wilfully make or assist in the making of any noise or diversion which disturbs or tends to disturb the peace or good order of such school session or class thereof . . . ."

**Appendix—Senior Center Code of Conduct**

MISSION STATEMENT

The Behring Senior Center of Monroe is a "home away from home", not negative and defeated, but positive and dynamic, looking for the brighter things in life.

It is a place where Senior Citizens have the opportunity to meet on a local level.

The Center will offer to Monroe, the surrounding area and out-of-town guests, recreation, education, information, social services and health services and encourage service to fellow citizens and the community in general.

OBJECTIVE

1. To foster pride and respect in the Behring Senior Center of Monroe facility, along with all equipment and furnishings there in.

2. To keep the Behring Senior Center environment pleasant and upbeat at all times.

3. To create a "home away from home" atmosphere for all who come to the Center.

4. To provide services, assistance and support to anyone 55 years of age or older.

5. To promote exemplary personal habits and cleanliness.

6. To create Senior credibility and integrity in the community.

## CODE OF CONDUCT

1. When in the Behring Senior Center of Monroe, all will be treated with respect and courtesy regardless of age, race or gender.

2. Use of abusive, vulgar, or demeaning language is prohibited.

3. Any physically threatening conduct is prohibited.

4. Members of the Behring Senior Center staff, outside instructors and Green County personnel will be treated in a respectful manner.

5. Thievery in any form will not be tolerated.

6. The possession or use of alcohol, illicit drugs or weapons of any kind is strictly prohibited.

7. The Behring Senior Center is a non-smoking environment.

8. Attention to personal hygiene is expected and appreciated by all who use the center.

9. Violations of this code of conduct will be acted upon by the Senior Center staff or Board of Directors.