In the

# United States Court of Appeals
## For the Seventh Circuit

No. 19-2994

LAVERTIS STEWART,

*Plaintiff-Appellant,*

*v.*

WEXFORD HEALTH SOURCES, INC., *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Western Division.
No. 3:12-cv-50273 — **Philip G. Reinhard**, *Judge.*

ARGUED FEBRUARY 17, 2021 — DECIDED OCTOBER 1, 2021

Before SYKES, *Chief Judge*, and FLAUM and ROVNER,
*Circuit Judges.*

ROVNER, *Circuit Judge.* LaVertis Stewart, an inmate at
Dixon Correctional Center, sued the assistant warden, two
doctors, and a medical corporation under the Eighth Amend-
ment, claiming that they were deliberately indifferent to his
serious medical needs by refusing to grant him an exemption
to wearing a restrictive security device, a black box, when he
left the facility for medical appointments. He alleged that the

black box caused extreme pain because of his existing medical conditions. The district court granted summary judgment for the various defendants, and we affirm.

**I.**

Before delving into the facts, we must return to first principles of summary judgment. We are faced once again with a case where the moving parties have presented some of the facts with a loose allegiance to the requirement that, on summary judgment, facts should be taken in the light most favorable to the non-moving party. Often this happens when the moving party appears, at first glance, to have more robust or convincing evidence to support its version of the facts. And because this is such a case, we will begin with the reminder that no matter how tempting it might be on summary judgment to be distracted by the sparkle of seemingly compelling facts, our assigned task is to take the facts in the light most favorable to the non-moving party—in this case, Stewart. *Payne v. Pauley*, 337 F.3d 767, 770–71 (7th Cir. 2003). On summary judgment we do not weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true. *Id.* We have "one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.* at 770 (quoting *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir.1994)). Summary judgment is appropriate when there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). With that reminder, we continue with a recitation of the relevant facts.

At the relevant times of this case, Stewart was incarcerated at the Dixon Correctional Center in Illinois. Stewart suffers from several medical ailments including carpal tunnel syndrome in both wrists, Hepatitis C, Grade III cirrhosis of the liver, neutropenia, lateral epicondylitis (tennis elbow), arthritis, shoulder impingement, shoulder capsulitis/arthritis and bursitis, and arthritis bone spurs. As a result of these conditions, Stewart resided in the medical unit and received extensive treatment, including pain medication, shots, physical therapy, orthopedic braces, and behavior modifications. He also had to visit medical doctors outside the prison with some frequency.

To prevent the risk of escape, and for the safety of others, the prison has a policy that all prisoners must wear a black box restraint when they are transported outside of the facility, absent a medical exemption from a prison doctor or nurse practitioner. Only the warden may overturn an exemption decision by the medical provider. A black box restraint is a metal cover that goes over the link between an inmate's handcuffs and the lock to prevent an inmate from picking the lock. Under the restraint, the prisoner's hands usually are positioned so that one palm is facing up and one is facing down. Because Stewart often had to travel far for medical appointments, he often wore the black box for up to eight to twelve hours. Stewart contends that this caused him excruciating pain and aggravated some of his medical conditions.

There is no written policy that addresses the criteria for a medical exemption from the black box requirement, but rather nurses and doctors grant or deny the exemption based on the individual requestor's medical needs and conditions, using professional standards and their own medical judgment.

As with many medical diagnoses and treatments, the various medical providers at Dixon have different ideas about what conditions warrant an exemption. The medical provider also decides on the length of the exemption, but in no event may it last longer than a year, at which point the prisoner must request a new exemption.

Stewart began requesting black box exemptions in early 2009 and his suit alleges instances of suffering due to a failure to get a black box exemption through the end of 2016. Over those seven years, Stewart had many different experiences with his black box exemption requests and with different providers. More often than not, his requests were denied, although at times they were granted. At times they expired without a renewal request by Stewart. On at least four occasions he filed grievances about wearing the black box, sometimes without having asked for an exemption. And on one occasion he skipped a medical appointment rather than wear the black box. Several different providers reviewed Stewart's requests and had different responses to them. Stewart's appeal focuses on one particular medical provider, Dr. Antreas Mesrobian, who was employed by Wexford Health Sources, Inc. (Wexford) as a Medical Director at the Dixon Correctional Center.[1] The Illinois Department of Corrections (IDOC) contracts with Wexford to provide medical services in some of its institutions. Dr. Mesrobian denied all of Stewart's requests for a black box exemption, but after each request he responded by examining Stewart, providing pain medication, referring him

---

[1] Stewart also sued Dr. Arthur Funk, but on appeal Stewart has dropped the claims against him. Dr. Mesrobian died on January 19, 2010, and Kenneth Blickenstaff was appointed by the Superior Court of California as the personal representative for the estate of Dr. Mesrobian.

to physical therapy or referring him for external orthopedic examinations. And although Dr. Mesrobian denied all of Stewart's requests, other Wexford doctors granted some of them. Further details of these exemption requests and denials are not relevant to the resolution of this appeal except where we include them below. More details of Stewart's requests for exemptions can be found in the district court's fact sections which we incorporate by reference. *Stewart v. Wexford Health Sources, Inc.*, No. 12 C 50273, 2019 WL 4279248, at \*\*1–5 (N.D. Ill. Sept. 10, 2019) (*Stewart v. Wexford*); *Stewart v. Wexford Health Sources, Inc.*, No. 12 C 50273, 2019 WL 4279241, at \*1–2 (N.D. Ill. Sept. 10, 2019) (*Stewart v. Steele*).

As a final comment on the facts as they pertain to Dr. Mesrobian and Wexford, we note that the facts section of their brief delves into Stewart's diagnoses, describing his medical conditions and whether those conditions might warrant a black box exemption. These are questions of fact presented in a light favorable to the moving defendants and therefore we make no assessment of the validity of those assertions. *See Payne*, 337 F.3d at 770.

In addition to suing Dr. Mesrobian and Wexford, Stewart also sued the Assistant Warden of Operations at Dixon, Wayne Steele. Stewart contacted Steele after then-current medical director of Dixon, Dr. Chamberlain, denied Stewart an exemption. Between May 2016 and April 2017, Stewart alleges that he sent Steele four letters through the prison mail system in which he complained that Wexford medical providers' refusals to give him a black box exemption was causing him excruciating pain. He also spoke with Steele on at least one occasion for a few seconds and explained how he was in pain from the black box and relaying that Dr. Chamberlain

had refused to grant an exemption. On appeal, Stewart asserts that there are questions of material fact as to whether Steele was deliberately indifferent to Stewart, whether IDOC failed to have adequate policies in place regarding black box exemptions, and whether IDOC had a widespread custom and practice of denying black box exemptions to inmates with conditions similar to his own.

Stewart filed a pro se complaint on July 19, 2012. The district court dismissed his amended complaint with prejudice, and we reversed and remanded on April 22, 2014. *Stewart v. Special Adm'r of Est. of Mesrobian*, 559 F. App'x 543 (7th Cir. 2014). After discovery on remand, on September 10, 2019, the district court granted summary judgment to both sets of defendants. Regarding the Wexford defendants (Dr. Mesrobian, Dr. Funk, and Wexford) the district court held that "[p]laintiff has not presented evidence, which if believed by the trier of fact, would allow a finding that Dr. Mesrobian's decision not to grant plaintiff a black box exemption was a decision no minimally competent professional would have made under the circumstances." *Stewart v. Wexford*, 2019 WL 4279248, at *6. As for a policy, the district court held that Stewart had "not offered any evidence that a policy allowing the exercise of professional medical judgment in determining whether to grant black box exemptions is, itself, a violation of plaintiff's Eighth Amendment rights." *Id.* at *9. And finally, the district court concluded that Stewart "present[ed] no other evidence of a custom or practice of denying black box exemptions for reasons other than the professional medical determination that an exemption was not warranted under the circumstances." *Id.* at *9. The district court went on to explain that "[t]here is no evidence any of the medical staff had final authority to establish Wexford's policy on granting or denying

black box exemptions. The evidence shows they were merely operating under that policy which was to allow the medical staff to decide whether an exemption for any given inmate was warranted under the circumstances." *Id.*

The district court issued a separate opinion granting summary judgment to Steele in which it held, "[t]he evidence does not show Steele was personally involved in any constitutional deprivation of plaintiff's rights or that he turned a blind eye to any constitutional deprivation, or that any constitutional deprivation occurred at all." *Stewart v. Steele*, 2019 WL 4279241, at *5. In reference to the claim against Steele in his official capacity, the court held that Stewart had not "offered any evidence that a policy allowing the exercise of professional medical judgment in determining whether to grant black box exemptions is, itself, a violation of plaintiff's Eighth Amendment rights," and "[t]here is also no evidence IDOC had an unconstitutional custom or practice regarding black box exemptions." *Id.* at *5–6. This timely appeal followed.

## II.

Stewart's claims rest in the Eighth Amendment's prohibition against cruel and unusual punishment. The Eighth Amendment prohibits a prison and its staff from being deliberately indifferent to the serious medical needs of a prisoner. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To forge a successful claim of deliberate indifference, Stewart must demonstrate that the defendants had subjective knowledge of the risk to the inmate's health and disregarded that risk. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Embedded within this deliberate indifference standard are both subjective and objective components. The subjective component requires the plaintiff to demonstrate that the prison official was "aware of facts from

which the inference could be drawn that a substantial risk of serious harm exists," and he must have "draw[n] th[at] inference." *Balsewicz v. Pawlyk*, 963 F.3d 650, 654–55 (7th Cir. 2020), *as amended* (July 2, 2020). The harm must also be objectively serious. *Id.* at 654. The standard of deliberate indifference "requires more than negligence or even gross negligence; a plaintiff must show that the defendant was essentially criminally reckless, that is, ignored a known risk." *Huber v. Anderson*, 909 F.3d 201, 208 (7th Cir. 2018) (quoting *Figgs v. Dawson*, 829 F.3d 895, 902 (7th Cir. 2016)). An inmate must establish that the prison official acted with "sufficiently culpable state of mind." *Farmer,* 511 U.S. at 834.

### A.  Claims against Dr. Mesrobian and Wexford

In the case of a claim of deliberate indifference against a medical professional, a prisoner must demonstrate that the medical professional's response was "so inadequate that it demonstrated an absence of professional judgment." *Johnson v. Dominguez*, 5 F.4th 818, 826 (7th Cir. 2021) (quoting *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 989 (7th Cir. 1998)). A difference of opinion among doctors is not sufficient evidence to establish deliberate indifference. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). "A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'" *Id.* (quoting *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008)). "To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). The use of a black box restraint does not, in and of itself, violate the Eight

amendment. *Knox v. McGinnis*, 998 F.2d 1405, 1412 (7th Cir. 1993). Therefore the only question is whether the prison and the medical providers were deliberately indifferent to Stewart's specific medical needs when they refused to give him an exemption to the use of the black box based on his personal medical history. In this case we can assume, for the sake of this appeal, that Stewart had a serious medical condition and that Dr. Mesrobian was aware of Stewart's condition. Consequently, we need only look to see whether any minimally competent professional would have made the same decision.

When Stewart requested a black box exemption, Dr. Mesrobian responded in various ways including by evaluating Stewart's complaints of pain, examining his shoulder and wrists, prescribing pain medication, and referring Stewart to physical therapy. We cannot say that no minimally competent doctor could have made the same assessment or that Dr. Mesrobian's response was "so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet*, 439 F.3d at 396. Nor does Dr. Mesrobian's conduct rise to the level of criminal recklessness that an Eighth Amendment violation requires. *Farmer*, 511 U.S. at 839–40 (equating criminal recklessness with deliberate indifference).

The fact that different medical providers did provide Stewart a medical exemption at various points in time does not force us to conclude that Dr. Mesrobian's course of action was not based on medical judgment. "[A] difference of opinion among physicians on how an inmate should be treated cannot support a finding of deliberate indifference." *Norfleet*, 439 F.3d at 396. For this reason, the fact that Stewart's oncologist at an outside facility recommended leather restraints does

not support a claim for deliberate indifference. Dr. Shah was Stewart's oncologist and not his orthopedic surgeon. And as an outside provider, Dr. Shah was not in a position to assess the security concerns of the prison. Dr. Mesrobian followed up with Dr Shah regarding his recommendation and investigated the need for the exemption. Unlike Dr. Shah, Dr. Mesrobian was balancing Stewart's subjective reports of pain, his own assessment of Stewart's medical conditions, and an assessment of the institution's security concerns and policies.

The balance between security and medical concerns adds an additional layer for us to consider. Ordinarily a court need not balance penological and security concerns against medical treatment. *See Whitley v. Albers*, 475 U.S. 312, 320 (1986). For example, whether a doctor recommends surgery or medication does not ordinarily impact prison security. But as the Supreme Court noted in *Whitley*, when the safety and security of other prisoners, staff, administrative personnel, and visitors is at issue, "a deliberate indifference standard does not adequately capture the importance of such competing obligations." *Id.* Instead, the Supreme Court announced that a court must ask, "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm," while considering "such factors as the need for the application of force, the relationship between the need and the amount of force that was used, [and] the extent of injury inflicted." *Id.* at 320–21 (internal citations omitted). "From such considerations inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Id.* at 321. In *Whitley*, the facts involved the use of force to subdue a

prison riot—a situation in which the threat was not hypothetical but real and imminent. This case is not one in which prison officials must make spur-of-the moment decisions about the use of force in order to stop an imminent security breach. At the same time, it does not present a situation in which the decision of the medical practitioner has no effect on external security and safety concerns. Prisoners who are taken to outside medical providers can pose a security threat to the transporting staff, to other inmates, to medical providers and to members of the public at the hospitals and doctors' offices to which they are taken. And as the court explained in *Whitley*, a court should give deference to prophylactic or preventative security measures just as it does in cases with rioting inmates. *Id.* at 322.

In this case, it is certainly true that the use of a black box restraint "could plausibly have been thought necessary." *Id.* at 321. The amount of force involved in the wearing of the black box is minimal, as it is merely a passive restraint. Generally, the harm in terms of the discomfort it causes is also minimal, although in Stewart's case it inflicted significant discomfort and pain. Nevertheless, there is no evidence that Dr. Mesrobian approved that use of force "maliciously or sadistically for the very purpose of causing harm." *Id.* at 320–21. The black box is a security measure and not a medical treatment. It makes sense, therefore, for a medical provider to default to the security needs of the prison unless the medical professional determines that an exemption is required for medical reasons. Taking the facts in the light most favorable to Stewart, Dr. Mesrobian recognized that the measure inflicted discomfort and pain but concluded, in his medical judgment, that an exemption was not necessary. The amount of force used was minimal and the security concerns significant.

Consequently, on this record, even with the facts taken in the light most favorable to Stewart, no reasonable jury could find that Dr. Mesrobian acted with deliberate indifference to a substantial risk to Stewart's health.

As for the defendant Wexford Health Services, private entities acting to fulfill government duties are not vicariously liable for the conduct of their employees. *Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658, 694 (1978). Instead, a plaintiff must demonstrate direct liability by showing that the constitutional violation was "caused by (1) an express municipal policy; (2) a widespread, though unwritten, custom or practice; or (3) a decision by a municipal agent with final policymaking authority." *Milestone v. City of Monroe, Wis.,* 665 F.3d 774, 780 (7th Cir. 2011). In this case, Stewart claims that Wexford had a widespread custom or practice of not granting black box exemptions to inmates with conditions similar to that of Stewart. In order to succeed on this claim, Stewart must present evidence of an "unconstitutional practice by the [prison's] staff that is so well settled that it constitutes a custom or usage with the force of law." *Palmer v. Marion Cnty.,* 327 F.3d 588, 596 (7th Cir. 2003).

As part of its contract with IDOC, Wexford must follow IDOC's administrative and institutional directives, including the requirement that all inmates wear black box restraints when they leave prison. The directive allows a medical doctor to issue an exemption when a medical condition so warrants. Therefore, it is IDOC policy that creates the presumption that an inmate will wear a black box outside of the prison unless medically contraindicated. Some Wexford physicians found that Stewart qualified for the exemption at some times, and others did not. Stewart has not provided any evidence that

Wexford had a widespread custom or practice of disallowing all exemptions for his condition. In fact, the evidence of Stewart's own experience indicates that the medical providers do as instructed and issue black box exemptions on a case-by-case basis based on the clinical facts before them, as Stewart himself sometimes received the exemption and sometimes did not. Stewart argues that the evidence that he was denied a medical exemption on multiple occasions and by multiple providers is a sufficient pattern of repeated behavior to create a factual question regarding a widespread pattern or practice. Although he was denied an exemption and forced to wear a black box on many occasions (twenty-three, by his count, (*see* Stewart Brief at 7, and Reply brief at 8)), by his own admission he also received medical exemptions from wearing the black box, sometimes for years at a time. *See* Stewart Brief at 10–11. He does not enumerate the times he received medical treatment but was not forced to wear a black box, but based on his many medical appointments and the years in which he was exempt, we can assume these were many, too. "To prove an official policy, custom, or practice within the meaning of *Monell,* [a prisoner] must show more than the deficiencies specific to his own experience." *Daniel v. Cook Cnty.*, 833 F.3d 728, 734 (7th Cir. 2016). But in this case, even Stewart's own experience indicates the lack of a *per se* policy against black box exemptions.

Stewart also claims that Wexford had a policy of inaction, and that a lack of policy or obvious gaps in policy created the constitutional violation. It is true that "the absence of a policy might reflect a decision to act unconstitutionally, but the Supreme Court has repeatedly told us to be cautious about drawing that inference." *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005) (citing *Bd. of the Cnty. Comm'rs of Bryan Cnty. v.*

*Brown*, 520 U.S. 397, 409–10 (1997) and *City of Canton v. Harris*, 489 U.S. 378, 388–89 (1989)). In this case, Wexford *did* have a policy that required medical providers to evaluate each prisoner on a case-by-case basis to assess the medical risks in light of the security concerns and according to medical standards. Wexford medical providers followed this policy, and at times granted Stewart an exemption even if, more often, they did not grant an exemption. This is not a case in which a prison allowed individual guards to make decisions as to whether a prisoner would wear a black box or not, without any guiding principles. In this case, the prison asked medical professionals to rely on their extensive medical training and judgment to evaluate complex and individualized medical conditions in light of prevailing security concerns. Even assuming the truth of all of Stewart's facts, Wexford did not have a policy or practice of *per se* denials of black box exemptions or of failing to perform assessments to determine whether an exemption was warranted.

Finally, a word on what we have not decided. As we noted earlier, the Wexford defendants spend several pages describing, for example, a lack of medical evidence that the black box position is harmful to carpal tunnel syndrome, shoulder bursitis or impingement, or that the black box would actually prevent aggravation to Stewart's shoulders. *See* Wexford brief at 31–33, 35. The Wexford defendants state that "the uncontroverted medical evidence described … [is] that use of the black box restraint would not require the placement of Stewart's shoulders or wrists in a position that would induce pain or aggravate his underlying conditions." Wexford brief at 35. As we noted earlier, these and similar descriptions and arguments impermissibly take the facts in the light most favorable to the Wexford defendants. *See Payne*, 337 F.3d at 770. In any

event, the factual determination is not necessary, as we have found that even if we credit Stewart's accounts of the pain he suffered from the use of the black box, we cannot say that no reasonable medical doctor, considering those complaints in light of the prison policy on black box restraints, could have made the same medical decision.

## B. Claims against Assistant Warden Steele

Stewart's lawsuit also alleged that Assistant Warden Steele, in both his individual and official capacity, violated Stewart's Eighth Amendment rights by failing to ensure that he received proper medical treatment.[2] As with Dr. Mesrobian and Wexford, Stewart must demonstrate that Steele knew of and disregarded a substantial risk of harm. *Farmer*, 511 U.S. at 837. Once again, we will assume for the purposes of summary judgment that Stewart had a serious medical need.

Taking the facts in the light most favorable to Stewart, Stewart sent four letters to Steele through the prison mail system and had one brief in-person conversation with him which Stewart describes a being "just a few seconds long." R. 413-4 at 8:19. Although there are no copies of the letters in the record and Steele denies receiving them, we must assume that letters sent through a prison mail system were received by the addressee. *Horshaw v. Casper*, 910 F.3d 1027, 1029 (7th Cir. 2018) ("Placing the note in the prison mail system supports an

---

[2] Stewart asserts that his claim is not one of failure to intervene, but rather a direct claim that Steele failed to ensure that Stewart received adequate medical care. (Reply brief at 11).

inference of receipt.")[3] We can assume, therefore, that Steele was aware of Stewart's complaint, not only from the letters, but from the conversation as well. In addition, Stewart pointed to evidence that Steele was aware that Stewart had filed a complaint through the non-emergency grievance process and that the grievance had progressed through this process. Stewart cited no evidence that the non-emergency grievance was not being addressed adequately or in the usual manner.

"If a prisoner is under the care of medical experts, a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011). Stewart argues, however, that when a non-medical prison official is aware of a risk of serious harm to a prisoner that is not being addressed, he cannot blindly rely on the fact that the prisoner is being treated by medical staff. For this he cites *Reed v. McBride*, 178 F.3d 849, 855 (7th Cir. 1999). We agree with Stewart, but conclude that this not a case where a prison administrator turned a blind

---

[3] Steele argues that Stewart waived this argument by failing to allege it with enough specificity in his statement of facts in that he failed to state that he mailed the letters through the prison mail system until this appeal. Steele is splitting hairs on this issue. It is true that in his original statement of facts Stewart does not mention that he placed the letters in the prison mail system, but in his Statement of Additional Facts, he states that he mailed the letters to Steele, and cites to his deposition testimony in which he testified that he placed the letters in the prison mail system. R. 420 at 3 (citing R. 413-4 at 10:15-11:10). In either case, given the fact that he was incarcerated, stating that he mailed letters to Steele was sufficient to put the defendants on notice that he was making a claim of mailing letters through the prison mail system. If there had been any doubt, the Statement of Additional Facts referenced his deposition testimony in which he makes this detail clear.

eye to a medical treatment failure. In *Reed* a prisoner with se-
rious medical needs stated that every Friday, when he re-
turned from treatment at the outside hospital, he was unable
to retrieve his identification badge until Monday and thus
was not permitted to receive food or medication for several
days each week. *Id.* at 851. He sent complaints to the superin-
tendent and other prison officials and filed grievances, and
they acknowledged their receipt, stated that they would re-
view the policy, but for two years did nothing to resolve the
problem. *Id.* Prison administrators can rely on medical per-
sonnel unless they have "reason to believe (or actual
knowledge) that prison doctors or their assistants are mis-
treating (or not treating) a prisoner." *Hayes v. Snyder*, 546 F.3d
516, 527 (7th Cir. 2008). Stewart has not presented any evi-
dence that Steele turned a blind eye to mistreatment. To the
contrary, the facts demonstrate that the medical personnel
were evaluating each one of Stewart's requests and deciding
whether, at that particular time, Stewart required an exemp-
tion. Steele is an expert in running a prison and making deci-
sions about safety concerns, but he is not a medical profes-
sional. He cannot assess how Stewart's unique medical con-
cerns might interface with the safety concerns. It seems rea-
sonable for him to delegate that assessment to the medical
personnel, and because the medical personnel were evaluat-
ing Stewart and granting and denying requests based on his
medical conditions, Steel was not blindly relying on medical
personnel. A complicated assessment of carpal tunnel syn-
drome or a rotator cuff injury is beyond the expertise of a
prison administrator. In contrast, in the *Reed* case, it does not
take a doctor to know that denying food and medication to a
person with serious medical needs would create a risk of
harm. The failure to act, in the *Reed* case was well within the

province of the administrators of the prison, as when and how a prisoner receives his security badge is not a medical decision. In this case, the prison administrators were not indifferent by depending on medical personnel to make medical assessments.

Stewart also claims that IDOC (through Steele in his official capacity) should have had more specific and directive policies regarding who should receive black box exemptions and that failure to create and implement such policies violate prisoners' constitutional rights. We cannot say that IDOC violated the Constitution by allowing medical providers to evaluate each requestor individually. Each prisoner presents a unique set of medical conditions and individualized experiences with pain. Allowing for an individual medical assessment is not evidence that IDOC failed to implement policies in a way that added up to deliberate indifference.

Finally, we do not find sufficient evidence to allow a reasonable jury to conclude that IDOC had an unconstitutional custom or practice of not giving black box exemptions to inmates with conditions like that of Stewart. As we noted above, Stewart himself sometimes received an exemption and sometimes did not. This is evidence that the IDOC did not have an unconstitutional custom or practice of not giving black box exemptions to inmates with conditions like Stewart's.

For the reasons described above, the decision of the district court is AFFIRMED.