**NONPRECEDENTIAL DISPOSITION**

To be cited only in accordance with FED. R. APP. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted June 10, 2022[*]
Decided June 13, 2022

**Before**

DIANE S. SYKES, *Chief Judge*

DIANE P. WOOD, *Circuit Judge*

MICHAEL Y. SCUDDER, *Circuit Judge*

No. 19-3135

| | |
|---|---|
| JOSÉ S. SOTO, Jr., *Plaintiff-Appellant*, | Appeal from the United States District Court for the Western District of Wisconsin. |
| *v.* | No. 17-cv-551-jdp |
| NANCY WHITE, et al., *Defendants-Appellees*. | James D. Peterson, *Chief Judge*. |

**O R D E R**

José Soto, a Wisconsin prisoner with painful foot conditions, contends that prison medical staff violated his rights under the Eighth Amendment by ignoring his need for more supportive shoes, physical examinations, and podiatrist appointments. The district court entered summary judgment for the defendants. Because no reasonable jury could find that the defendants deliberately ignored Soto's foot pain, we affirm.

---

[*] We have agreed to decide the case without oral argument because the briefs and record adequately present the facts and legal arguments, and oral argument would not significantly aid the court. FED. R. APP. P. 34(a)(2)(C).

We relay the facts in the light most favorable to Soto, the nonmovant at summary judgment. See *Thomas v. Martija*, 991 F.3d 763, 767 (7th Cir. 2021). Soto's congenital foot deformity leads to flareups of two painful conditions: plantar fasciitis and Achilles tendinitis. His access to footwear is central to this case.

At his prison, Waupun Correctional Institution, most prisoners in the general population wear state-issued shoes but may buy "personal" shoes from approved vendors. In segregation, the default shoe is a state-issued slip-on, and prisoners have no right to "personal" shoes; still, staff can order orthopedic shoes when medically necessary.

For Soto, however, custom rules stem from a 2013 settlement agreement in a prior footcare lawsuit: He may use personal funds to order general-population shoes from vendors of his choosing; the prison must furnish his orthotics and send him to a podiatrist for evaluations once every five years; and in segregation he receives state-issued Velcro shoes with arch-support inserts, not the usual slip-ons.

In January 2015, while in the general population, Soto told staff that his orthotics no longer fit his personal shoes, causing pain. Dr. Jeffrey Manlove, a prison physician and a defendant here, referred him to a podiatrist who is not a defendant. The podiatrist wrote that "the state issued athletic shoes are very unsupportive, flimsy, and the orthotics seem to be sitting or sinking into the heel." She suggested that "a better quality shoe, such as New Balance or similar athletic shoe that can fit his orthotics, will likely resolve the right foot pain."

Soto took this specialist's note as an opinion that the *prison* should buy better athletic shoes for him because they were medically necessary. But Dr. Manlove took the note to mean only that, in keeping with the settlement agreement, Soto could purchase his own New Balance or similar athletic shoes.

Nevertheless, one defendant, Nurse Donna Larson, told Soto that she had ordered New Balance shoes for him. But Soto never received the shoes. The record does not show whether Larson actually ordered the shoes or why, if she did, Soto never got them. Soto, for his part, states in a declaration that additional medical staff told him that the shoes were ordered by someone, and that when he complained about not receiving them, Larson and other medical staff told him to "just deal with it."

Along the way, Soto was transferred to another prison for three months. When he returned to Waupun in May 2015, he was placed in segregation. He saw Dr. Manlove again that August and September, complaining that the Velcro segregation shoes were causing pain and that he never received any New Balance shoes. Dr. Manlove inspected Soto's segregation shoes, concluded that they were "in poor repair," and asked an unnamed health services manager to "see about replacements."

In September 2015 Soto returned for one year to Waupun's general population, where he could wear personal shoes if he purchased them. Records of his several appointments with Dr. Manlove during this time reflect no complaints of foot pain. Still, Soto's declaration at summary judgment states in general terms that his pain and complaints were ongoing, and a nurse's note in the record observes that Soto once complained of chronic foot pain and requested new shoes.

Soto returned to segregation the next year, in September 2016. There, he again asked for new segregation shoes, even offering to purchase them on his own. But, according to Soto's declaration, four nurses told him that he could not get other shoes. And some health-services responses in the record stated that the 2013 settlement agreement confined Soto to the shoes he already had. Soto continued to file intermittent complaints about his shoes (both segregation and personal) through the fall of 2017. During this time, Soto moved back and forth from segregation to the general population, spending a total of about four months in segregation.

Then, in October 2017, according to Soto's declaration, unnamed staff who were handling his segregation shoes and orthotics lost them. Soto complained to a nurse who is not a defendant here and to a health services manager who is. The health services manager (Chrystal Marchant) took Soto to try on several replacement pairs; Soto found none that fit; and so Dr. Manlove referred him to an orthotist to see about new custom orthotics and shoes.

What happened in the interim is unclear, but the next summer, Soto received new custom orthotics and orthopedic shoes that he is now permitted to wear throughout the prison—both in general population and in segregation. Still, Soto soon complained that the new orthotics did not fit and were causing severe pain. He met with Dr. Manlove in October 2018, prompting another referral to an orthotist.

Ultimately, Soto sued, alleging that nine of Waupun's medical staff— Dr. Manlove, four health services managers (Marchant, Nancy White, Belinda Schrubbe, and Ann Scarpita), and four nurses (Nurse Larson, plus Ann York, Gail Waltz, and

Amy Gunderson)—were deliberately indifferent to his foot pain in violation of his rights under the Eighth Amendment. See 42 U.S.C. § 1983. Only Dr. Manlove is named in Soto's appellate brief, however.

During discovery, the judge denied without prejudice Soto's initial requests for recruited counsel. Soto also requested help paying for deposition transcripts; alternatively, he sought leave to pursue depositions without transcription. *Cf.* FED. R. CIV. P. 30(b)(3)(A) (party seeking deposition must bear recording cost). Soto reasoned that written discovery (e.g., written interrogatories and requests for admission) would be inadequate because the counseled defendants were sure to be evasive and use lawyers' tricks to blur the facts. Live depositions, he said, would force more candor.

But in a thoughtful written decision, the district court denied this request without prejudice to renewal: No federal rule required financial assistance for depositions; too-easy access to subsidized depositions before written discovery could increase unwarranted prisoner litigation and reduce incentives to use written discovery efficiently; and it was too early to speculate that the defendants would not faithfully comply with written discovery. *Soto v. White*, No. 17-CV-551-JDP, 2018 WL 6338753, at *1–3 (W.D. Wis. Dec. 5, 2018); see *McNeil v. Lowney*, 831 F.2d 1368, 1373 (7th Cir. 1987) (holding that the district court had no statutory authority to waive witness fees for plaintiff proceeding *in forma pauperis*); *Johnson v. Hubbard*, 698 F.2d 286, 289 (6th Cir. 1983) ("[T]here is no constitutional requirement to waive costs of transcripts, expert witness fees, and fees to secure depositions."). Still, the judge explained, if Soto tried his hand at written discovery and could show that the defendants' responses were inadequate, the judge would again consider recruiting counsel or permitting un-transcribed depositions.

Yet Soto made no such showing. Neither side took depositions. Nurse Larson, in particular, did not supply a declaration or affidavit, and the record does not suggest that Soto served her with interrogatories or requests for admissions. And so the defendants moved for summary judgment, citing a lack of evidence from which jurors could infer deliberate indifference. In response, Soto did not suggest that the record needed to be expanded through additional discovery under Rule 56(d) of the Federal Rules of Civil Procedure. Instead, he contended that the existing record would permit jurors to find that the named defendants were reckless to the point of deliberate indifference. The judge, however, concluded that a jury could not so find. Thus, despite concerns that the overall handling of Soto's footcare was at times troublesome, the judge entered summary judgment for the defendants.

On appeal, Soto does not contest the adequacy of discovery or denials of recruited counsel; instead he renews his contention that the record would permit jurors to infer medical mistreatment so reckless that it counts as unwarranted punishment under the Eighth Amendment. See *Farmer v. Brennan*, 511 U.S. 825, 836 (1994); *Jones v. Mathews*, 2 F.4th 607, 612–13 (7th Cir. 2021); see also *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 763 (7th Cir. 2021) (opining that defendants' mental state must approach criminal recklessness). Collective failures of care are not enough; to prevail against any defendant at trial, Soto would need jurors to find that the individual defendant acted with the requisite deliberate indifference. See *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018). He has not done so.

Soto first argues that Dr. Manlove was reckless for not buying him new shoes on the podiatrist's recommendation. But, for Soto's time in the general population, Dr. Manlove's interpretation—that although better athletic shoes were advisable, the settlement agreement made it Soto's personal responsibility to buy them—makes sense. Regardless of whether that interpretation is ultimately correct, any misunderstanding on the doctor's part would not permit jurors to infer that he recklessly disregarded Soto's pain. The same goes for Dr. Manlove's assumption that the podiatrist's reference to "athletic" shoes did not mean special medical shoes (for which the prison ordinarily would pay).

As for segregation shoes, Soto points to Dr. Manlove's admission that his set was in poor repair. Yet the doctor's declaration attests that he spoke to health services about replacing Soto's shoes with a newer version. The lack of follow-up may be concerning, but it would not be enough for jurors to conclude that the doctor was "essentially criminally reckless." See *Stewart*, 14 F.4th at 763.

Nor has Soto created a triable issue for his theory that other nurses and health services managers were deliberately indifferent by not ordering him more supportive shoes. Soto's most robust theory on this point concerns Nurse Larson, who told Soto in March 2015 that New Balance athletic shoes had been ordered on his behalf and, when at some point Soto complained to Larson about not receiving them, told him to "deal with it." Her reassurance that the shoes were on the way might have deterred him from ordering his own (though, again, his persistent view has been that the prison must buy them). And from the summary judgment record, Nurse Larson's interactions with Soto are puzzling. But this puzzlement does not add up to a triable deliberate-indifference claim. The record is so unclear about whether Larson actually ordered the shoes, what her shoe-ordering duties might have been, and why (if she ordered them) Soto did not receive them, that a reasonable factfinder could not infer that her conduct went beyond

negligence or simple recklessness. See *Jones*, 2 F.4th at 612–13. Regarding the segregation shoes, the nurses and health services managers explained to Soto that they thought his settlement agreement did not allow different shoes. A reasonable factfinder could not infer that this interpretation, even if mistaken, was deliberately indifferent.

Next, Soto contends that a jury could find that the defendants were deliberately indifferent to his foot pain because they did not physically examine his feet or send him back to a podiatrist after his last appointment with one in 2015. Yet Soto did not provide any evidence that a medical professional would typically order another examination or appointment to treat his foot conditions. Without more, a jury could not find that the defendants' failure to order that course of treatment grossly deviated from acceptable professional judgment. See *Lockett v. Bonson*, 937 F.3d 1016, 1024 (7th Cir. 2019).

Finally, Soto points to the poor fit of the orthotics he received in summer 2018 and the lengthy process for acquiring new orthotics. But the summary judgment record does not permit an inference that any named defendant was reckless or worse in the ordering process and follow-up care.

AFFIRMED